IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN McALLISTER; | CIVIL NO. CV-04-00625 SOM-BMK |
| Plaintiff, | |
| vs. | |
| UNIVERSITY OF HAWAII; | |
| KAPIOLANI COMMUNITY COLLEGE; | MEMORANDUM OF POINTS AND |
| JANE CALFEE, Instructor at | AUTHORITIES IN SUPPORT IN |
| Kapiolani Community College; | OF INJUNCTION |
| RICHARD DOE, Academic Counselor | |
| at Kapiolani Community College; | |
| JILL MAGNAGON, Director of | |
| Academic Counseling Services at | |
| Kapiolani Community College; | |
| MONA LEE, Dean of Student Services | |
| Kapiolani Community College, | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT IN OF INJUNCTION

### A. PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF

The Irreparable harm cause to Plaintiff by the Defendants actions is enormous and increasing every day. Plaintiff is entitled to and in need of injunctive relief. Defendant Mona Lee's recent placement of a financial bar in the amount of $750.00 preventing Plaintiff from registering for University courses and obtaining his U.A. Army Veteran's V.A. educational beneifits is causing irreparable harm to Plaintiff's career as a college student and prospective graduate and employed social worker. For the past two years the Defendant's University of Hawaii KCC and Mona Lee were satisfied with payment of this sum in $50 monthly installments.

Since Plaintiff is a student on a limited income and does not work full time, he has done well to pay the debt down to $750.00, it's present balance. But the hold on his transcripts and registration for new Summer quarter courses at U of H Manoa, where Plaintiff is now attending, has prevented him from continuing his edication, for he must be registered in school to obtain his V.A. benefits. Exhibits A-B-C- D-E.

The Defendants, especially Mona Lee are liable for intentionally retaliating against Plaintiff and causing Plaintiff these additional damages and attempting to put Plaintiff out of school altogether this summer in 2006, and continue to deny him his Federal Right to a non-discriminatory publicly financed educational opportunity, like they did at KCC in 2003, before he left and graduated with honors from HCC.    Ex D.

The harm the Defendants have caused to Plaintiff will increase every day Plaintiff is prevented from matriculating in college classes at universities, who demand a copy of Plaintiff's transcripts, which defendant's are withholding, and thus preventing Plaintiff from transferring or matriculating lawfully at school.    Plaintiff has presented evidence here of the on ongoing harm caused by Defendants illegally and maliciously in a Retaliatory fashion against Plaintiff.

In HASHIMOTO v. DALTON, 118 F.3d 671 (9th Cir. 1997) the Ninth Circuit stated relative to an analogous situation of illegal retaliation that :

> " In this Title VII action, an Asian-American woman alleges incidents of disparate treatment and retaliation by her former employer, the Department of the Navy. The district court ruled in favor of the Navy on all but one of plaintiff's claims. On the remaining claim, the court concluded that the Navy retaliated against the plaintiff for filing an administrative complaint with the Equal Employment Opportunity Commission ("EEOC"). The court awarded attorney's fees.
>
> [3] The Navy appeals the award of fees. Plaintiff cross-appeals the court's rejection of her other claims. We have carefully reviewed the record, and conclude that no reversible error occurred. Accordingly, we affirm.

"Just as in Hacienda Hotel, the government's argument in this case fails recognize the distinction between a violation and the availability of remedies. Lowery's dissemination of the adverse job reference violated Title VII because it was a "personnel action" motivated by retaliatory animus.

That this unlawful personnel action turned out to be inconsequential goes to the issue of damages, not liability. See, e.g., Smith v. Secretary of Navy, 659 F.2d 1113, 1120 (D.C. Cir. 1981) ("**[T]he questions of statutory violation and appropriate statutory remedy are conceptually distinct.**

An illegal act of discrimination — whether based on race or some other factor such as a motive of reprisal — is a wrong in itself under Title VII, regardless of whether that wrong would warrant an award of [remedies].") (citation omitted); Sparrow v. Piedmont Health Sys. Agency, Inc., 593 F. Supp. 1107, 1119 (M.D.N.C. 1984) (agency's retaliatory refusal to provide a letter of recommendation violated Title VII, but plaintiff was not entitled to a remedy because he failed to demonstrate any harm resulting from the agency's action).

[23] [6] Further, as in Hacienda Hotel, adoption of the government's position would undermine both the letter and the spirit of Title VII's prohibition against actions in retaliation for EEO activities. **We have recognized that actions taken in retaliation for the exercise of Title VII rights can have a "deleterious effect on the exercise of these rights by others."** Garcia v. Lawn, 805 F.2d 1400, 1405 (9th Cir. 1986).   (Emphasis added)

Although this particular harm was not suffered by Hashimoto in the present case because she was no longer employed by the Navy, the chilling effect which Lowery's retaliatory conduct might have on the remaining employees under his supervision does counsel against accepting the government's narrow conception of what constitutes a "violation" of Title VII. Accordingly, we conclude that the retaliatory dissemination of a negative employment reference violates Title VII, even if the negative reference does not affect the prospective employer's decision not to hire the victim of the discriminatory action.   HASHIMOTO v. DALTON, 118 F.3d 671 (9th Cir. 1997)

FUNAI v. BROWNLEE, (Hawaii 2004)  Civ. No. 03-00160 ACK/BMK.

United States District Court, D. Hawaii.   November 23, 2004
  b. "Participation Clause"

"It is well settled that the participation clause shields an employee from retaliation regardless of the merit of his EEOC charge." Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978) (citing Pettway v. American Cast Iron Pipe Co., 411 F.2d 998, 1007 (5th Cir. 1969).

Accordingly, the Ninth Circuit has held that "[u]nder the participation clause, . . . there can be little doubt that [a Plaintiff's] visit with the EEO counselor constitute[s] participation `in the machinery set up by Title VII.' As such, it [is] protected activity." Hashimoto v. Dalton, 118 F.3d 671, 680 (9th Cir.

1997) (quoting Page 17 Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978) (other citations omitted).

A plaintiff can establish a causal connection by "demonstrat[ing] that the individual who allegedly retaliated against her was responsible for the decision to terminate her or had significant input in that decision." McGinnis v. United States Air Force, 266 F.Supp.2d 748, 774 (S.D. Ohio 2003) (citing Page 20 Kauffman v. Allied Signal, Inc., 970 F.2d 178, 185 (6th Cir. 1992)) ; Paroline v. Unisys Corp., 879 F.2d 100, 104 (4th Cir. 1989) (citing Tafoya v. Adams, 612 F. Supp. 1097, 1104 (D. Colo. 1985)), modified on other grounds, 900 F.2d 27 (4th Cir. 1990) (en banc). However, a decision maker's knowledge of a conflict between a plaintiff and a coworker with an allegedly discriminatory animus does not alone establish that the decision maker had a discriminatory motivation. Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2004).

When there is no evidence of a decision maker's discriminatory animus, a plaintiff can still prove causation by presenting evidence that the decision maker simply "rubber stamped" the decision of a subordinate who did have a retaliatory motive. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 288 (4th Cir. 2004) (reasoning that there will be no basis for finding discrimination if the decision maker made an "independent decision to fire" plaintiff); Vasquez, 349 F.3d at 641, n. 9 ("no nexus exists when the decision maker makes an independent and legitimate decision to discipline the plaintiff.").

"[E]ven if the ultimate decision-making body is unbiased, there can still be liability imposed if subordinates to that body set in motion a chain of events that lead to the constitutional deprivation." Ostad v. Oregon Health Sciences Page 21 Univ., 2000 WL 900411, at * 4 (D. Or. 2000) (citing Gilbrook v. City of Westminster, 177 F.3d 839, 854 (9th Cir. 1999) (holding that jury could have reasonably found causation where "the disciplinary process [] began with a retaliatory motive, but ended with a legitimate one. That is, although the ultimate decision-maker [] had a legitimate motive to impose discipline, the retaliatory motives of two subordinates [] set in motion the chain of events that led to [plaintiff's] review and to the adverse employment action."). FUNAI v. BROWNLEE, (Hawaii 2004) Civ. No. 03-00160 ACK/BMK.

Injunctive Relief is authorized under 42 U.S.C. 1981, 42 U.S.C. 1982; 42 U.S.C. 1983; 42 U.S.C. 1985, 42 U.S.C. 1986 and 42 U.S.C. Section 20OOd, pursuant to 42 U.S.C. §§ 12101, The American Disabilities Act Section 504. In the Ninth Circuit Preliminary Injunctive Relief is available upon a showing of either 1) A combination of probable success upon the merits and a

showing of Irreparable harm or   2) Serious questions raised and a balancing of hardships tipping in the moving party's favor.   Prudential Real Estate Inc. vs. PER Realty Inc. 204 F 3rd 864, 874 (9th Cir. 2000)   These alternative formulations represent two points of a sliding scale in which the required degree of irreparable harm increases as the probability to success increases. Id.

Plaintiff John McAllister, therefore Petitions this court for an order enjoining the Defendants Mona Lee and the University of the State of Hawaii from, baring his University registration due to the disputed $750.00 debt dated back to the time of Plaintiff's discriminatory treatment at KCC, and order the School of Social Work to disregard all failing grades erroneously and maliciously assigned to Plaintiff in retaliation for his having protesting the discriminatory treatment he was repeatedly encountering at KCC.

The original monthly installment plan unalaterally and maliciously terminated suddenly by Defendant Mona Lee should be re-instated forthwith, and the Plaintiff's grades, records and transcripts with the U of H system "unfrozen" and he be allowed to transfer to Hawaii Pacific University or enrolled into the U of H Manoa School of Social Work, forthwith.

WHEREFORE, the Plaintiff respectfully requests this Court to grant the following relief:

1. A declaratory judgment be issued that the Plaintiff's rights have been violated as alleged above.

2. A preliminary and permanent injunction to have the Defendants desist from the illegal practice of discrimination, harassment, and retaliation "Unfreeze" Plaintiff's grade records, and transcripts

3. Allow Plaintiff to register for all courses he desires that he is eligible for immediately forthwith at U of H Manoa.

4. Order the School of Social Work at UH Manoa to re-evaluated Plaintiff's application for enrollment to the School of Social Work program without considering the failing grades ascribed to Plaintiff during 2003, in retaliation for Plaintiff's having protested being subjected to repeated acts of racial discrimination, which trying to exercise his U.S. Army veterans benefits at a publicly funded University.

5. An award to the Plaintiff for all costs and attorney's fees arising from this litigation.

6. Such other and further relief as this Court deems appropriate.

## 2. SUMMARY OF PLAINTIFF'S CLAIMS

That in Plaintiff's Complaint has sued all of the Defendants for violation of each cause of action, officially and individually, due to the vagaries and the history of the evolution of the U.S. civil rights laws from 1866 to the present, to make sure that his claims were perfected. Those claims being:

1. VIOLATION OF FOURTEENTH AMENDMENT TITLE VI, 42 U.S.C. 2000(D).
2. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.
3. VIOLATION OF 42 U.S.C. 1981 & 1981A.
4. VIOLATION OF 42 U.S.C. 1983.
5. VIOLATION OF 42 U.S.C. 1985.
6. PUNITIVE DAMAGES.

On May 16, 2005, after the Parties discussions, the court entered a stipulation agreed to by the parties to dismiss certain individual Claims against certain individual defendants, and certain claims against the State. This greatly clarified the case.

Consequently, the claims presently remaining against the Defendants are:

1. Defendant U of Hawaii:   Causes of Action: 1, 3, 4 and 5.

2. Defendant Jane Calfee:   Causes of Action:   2, 3, 4, 5 and 6.

3. Defendant Jill Makdagon:   Causes of Action:   2, 3, 4, 5 and 6.

4. Defendant Mona Lee: Causes of Action:   2, 3, 4, 5 and 6.

A jury trial is pending for August 18, 2006 on the material issues of fact, which include but are not limited to.

1) Whether Jane Calfee's use of the "N....r" word racial slur (encouraging reluctant students to use the racial slur in class, when they did not want to, and whether doing so was in "reckless disregard for the violation of Plaintiff's Title VI right to non-discrimination in Public V.A. financed college education) was racist and improper.

2) Whether Plaintiff's unrequested expulsion from her class and assignment of an "F" was improper violation of and or retaliation for his exercise of his civil right to complain about racism in his English class instruction.

3) Whether the denial of tutoring services by Richard Doe and other tutors violated his civil rights.

4) Whether all of the above with the addition of the Kapio Jason Hahn newspaper articles frequently publishing the "N...r" word racial slur in articles week after week, triggered by comment and protest over Jason Hahn original untenable premise that the Hawaiian word Haole is the same as using the "N.....r" word. When any local knows, the Hawaiian language had another word, "Popolo", for African-Americans in the first place.   The "N...r" word was imported into the Hawaiian islands, and so linguistically cannot be considered a Hawaiian word by any stretch of the imagination.

5) Whether the sum total of these several actions demonstrated the existence of a "hostile educational environment" at KCC which violated the Plaintiff's Constitutional Right to a non-discriminatory V.A. Federally funded public college education.

These are just some material questions of fact which should be submitted to the jury in this case in vindication of Plaintiff's right to seek redress in the U.S. Courts for intentional Title VI, and 42 U.S.C. 1981, 1983 and 1985 violations, of Defendants Jane Calfee, Mona Lee and Jill Makdagon in this case.

The facts demonstrate the basis basis for the several causes of action for systemic discriminatory denial of non-discriminatory Public education at KCC both individually (through the direct discriminatory incidents that happened to him and systematically both in the case of the racial slur ladened school newspaper and systematically, permanently and historically excluding African-American students from enrollment in the University of Hawaii KCC Radiology technician school in some detail.

Plaintiff complains that the rampant and unnecessary and incorrect and insensitive use of the racial slur "N....r" in his English 100 classes and numerous KCC school newspaper articles in 2003 created a "hostile educational environment." for the African-American students and him in particular.

This was further demonstrated by the discriminatory treatment Plaintiff received at the Holumua Tutoring center when he was denied services given other students and paid for by the V.A. due to his race by the tutor Richard in a blatant and public manner in March of 2003. And the KCC administrator's Makdagon and Calfee's subsequent denial of further tutoring services to Plaintiff and the order to Plaintiff to cease to come to the Holumua Center, unlike other students whose tutoring services were paid for in advance by the V.A. or other Federal government

programs, certainly made it harder for him to complete his courses on time. And in fact because of these problems with discrimination, he did not.

And that Plaintiff's polite expression of disagreement to English teacher Jane Calfee's racist interpretation of the Gloria Naylor essay "The Meaning of a word" and her encouragement of reluctant students to use the "N...r" word racial slur in class, also lead to his unapproved and unrequested expulsion from her English 101 class and the assignment of a failing "F" grade given to him by another unknown KCC employee. Facts which denied him his right to a non-discriminatory education in a Veteran's Administration funded State of Hawaii Community College.

Plaintiff never asked for nor agreed to a re-assignment of his English 101 class, and the other class mentioned to him conflicted with his job work schedule at the V.A., which was paying for his tuition and matriculation. The retaliatory expulsion from the Calfee English 101 class, and the resulting "F" for English 101 seriously disrupted Plaintiff's completion of the requirements for the Radiology program at KCC in a timely manner under V.A. standards, and the V.A. then ordered Plaintiff to enroll in another school due to KCC's arbitrary and discriminatory treatment of Plaintiff a government subsidized U.S. Army veteran student. Ex A, B, C, D, E,F, & H.

Jane Calfee demonstrated a racist teaching agenda by the manner in which she used the racial slur "N....r" in her class; and her and the State Defendant's subsequent retaliation against Plaintiff for expressing his correct disagreement with her incorrect definition and use of the fighting word racial slur, according to Hawaii law, by removing Plaintiff from the English 100 class and assigning him and "F" grade. Each and every one of these intentionally discriminatory actions denied Plaintiff his right to non-discriminatory public education at KCC.

Plaintiff clearly has a cause of action against the named Defendants based upon the allegations specified in the complaint, which must be viewed from the light most favorable to the non-moving Plaintiff. The frequency of the harassment and futile complaint process and lack of remedies provided by the KCC administrators denied Plaintiff of his right to racially non-discriminatory Federally funded publicly University education, and admission to the Radiology program at KCC. Which apparently has never admitted an African-American student.

> Clearly sovereign immunity is not directly implicated: suits brought under § 1983 against individual officers in their individual capacity for violations of the Constitution do not implicate sovereign immunity. See, e.g., id. at 1155 n. 11 ("Vinson's individual capacity claim against Thomas does not implicate the State's sovereign immunity under either the ADA or the Rehabilitation Act."). Rather, the State is claiming that Miranda B. failed to make out a valid claim under § 1983 because her claim is premised on Title II and Section 504, which we have held foreclosed a remedy under § 1983. See id. at 1156. MIRANDA B. v. KITZHABER, 328 F.3d 1181 (9th Cir. 2003)

### 5. ADDITION DISCRIMINATORY ACTIONS PROVIDE CLEAR PROOF OF "HOSTILE EDUCATIONAL ENVIRONMENT FOR BLACK STUDENTS

The KCC student newspaper during this time period of summer and fall of the year 2003, Jason Hahn, one of writers for the school paper at Kapiolani Community College, The Kapio, decided to write a series of articles prominently featuring the "N" word which, curiously enough, in a decision in September of 2003, the Hawaii State Supreme Court ruled that the "N" word was a racial slur and a fighting word. While Mr. Hahn's use of the "N" word predictably flared up intense feelings, protests by the African American students and other students that recognize that it was an insult and a racial slur to refer to anyone using the "N" word and to print it, and the continued debate about it fostered a hostile environment at the campus of Kapiolani Community College about which numerous faculty and students complained.

Jason Hahn's attempts to analogize between the Haole word and the "N... r" word in the

KCC school paper, was an exercise in bigotry and ignorance. Not only did Hahn get his languages mixed up.

For "Popolo", is the Hawaiian word for African-American. Referring generally to black berries. As in the old adage "The blacker the berry, the sweeter the juice." Indeed in Italian Popolo means people.

Hahn's confusion of Hawaiian and the English languages and his ignorance of history regarding the slavery creation and uses of the "N...r" word, and the Hawaiian word Popolo demonstrate a clear case of narcissism, thinking the world revolves around him. Even if he does not know where he is or anything about the Hawaiian language or American history. And of course his and KCC's publication of this linguistically incorrect article, evidences discrimination against black students or a reckless disregard for the rights to be free from racist harassment of the African-American Students at KCC campus, to say the least. For any professional educator knows that increasing the use of racial slurs on campus increases the likelihood and incidents of racial harassment of the students so intentionally racially slurred.

Plaintiff also had experienced discriminatory treatment when he attempted to receive mathematics tutoring services at the Holomua Tutoring Center. The Defendants have acknowledged that the tutor, Richard, refused to give him service at all, and then commented saying that the reason he did so was because he was discriminating against Plaintiff because he was a black man. The African American secretary at the school witnessed those comments, and other racial comments were directed at her as well.

However, as a result of the school's decision to terminate Richard, the tutor, Plaintiff experienced derogatory harassment from Caucasian students and friends and associates of Richard, the tutor, who objected to Plaintiff's complaints of violation of Title VI of the 1964 Civil

Rights Act and 41 U.S.C. 1981 and other civil rights acts.

Plaintiff was told that he was no longer welcome in the Holomua Tutoring Center on the order of Jill Makdagon, as a result of his seeking alternate matmatics tutors due to the Richard and other discriminatory incidents. However, the University failed to provide him suitable substitute tutoring services. The tutors that they attempted to provide for Plaintiff either had scheduling conflicts or simply failed to show up. As a result, Plaintiff was delayed in passing his mathematics and English courses, which caused complications with his VA loan benefits, which did not allow any delays or repeating of courses for which they had paid.

Moreover, Plaintiff's doctor at the Veterans Administration wrote to Mona Lee, the Dean of Students at Kapiolani Community College, and explained that as a result of emotional distress due the numerous incidents of discrimination that Plaintiff directly suffered at the University of Hawaii, Kapiolani Community College in the fall of 2003, he would require some additional time to complete his course work.

In a series of memorandums, the University promised a number of remedies for Plaintiff. However, none of those promises were kept and none of those remedies were actually provided. Ultimately, the VA directed Plaintiff to withdraw from Kapiolani Community College and enroll in another school where he would not be subjected to such blatant repeat instances of racism.

These actions violate the prohibitions stated in DAVIS v. MONROE COUNTY BD. OF ED., 526 U.S. 629 (1999) and MONTEIRO v. THE TEMPE UNION HIGH SCHOOL DIST., 158 F.3d 1022 (9th Cir. 1998)

> [28] We do not, of course, suggest that racist actions on the part of teachers implementing a curriculum could not comprise discriminatory conduct for the purposes of Title VI or the Fourteenth Amendment.

Nor do we preclude the prosecution of actions alleging that schools have pursued policies that serve to promote racist attitudes among their students, or have sought to indoctrinate their young charges with racist concepts.

[34] <u>According to the Department of Education, a school district violates Title VI when (1) there is a racially hostile environment; (2) the district had notice of the problem; and (3) it "failed to respond adequately to redress the racially hostile environment." 59 Fed. Reg. at 11449. The agency's publication expressly states that a hostile environment can be caused by the conduct of peers. "Under this analysis, an alleged harasser need not be an agent or employee of the recipient because this theory of liability under Title VI is premised on a recipient's general duty to provide a nondiscriminatory educational environment.</u>" Id.

1. Hostile Environment

[35] The Department of Education defines a "racially hostile environment" as one in which racial harassment is "severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by the recipient." Id. at 11449.

Whether a hostile educational environment exists is a question of fact, determined with reference to the totality of the circumstances, including the victim's race and age. Racial harassment creates a hostile environment if it is sufficiently severe that it would interfere with the educational program of a reasonable person of the same age and race as the victim. 59 Fed. Reg. 11449; see Ellison v. Brady, 924 F.2d 872 (9th Cir. 1991)

Moreover, racist attacks need not be directed at the complainant in order to create a hostile educational environment. 59 Fed. Reg. 11449-50. See also Patterson v. McLean Credit Union, 491 U.S. 164, 180 (1989) (holding that racial harassment in the workplace is actionable under Title VII); Waltman v. International Paper Co., 875 F.2d 468, 477 (5th Cir. 1989) (sexual graffiti not directed at plaintiff relevant to show Page 1034 hostile work environment under Title VII); Walker v. Ford Motor Co., 684 F.2d 1355 (11th Cir. 1982) (evidence of racial harassment directed at others relevant to establish hostile work environment under Title VII).

[36] In her amended complaint, Monteiro alleged that her ninth-grade daughter and other similarly situated African-American students attended a school where they were called "niggers" by white children, and where that term was written on the walls of the buildings in which they were supposed to learn civics and social studies.   It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts.

As the Investigative Guidance notes, "verbal harassment of a young child by fellow students that is tolerated or condoned in any way by adult authority figures is likely to have a far greater impact than similar behavior would on an

adult." 59 Fed. Reg. 11449. A school where this sort of conduct occurs unchecked is utterly failing in its mandate to provide a nondiscriminatory educational environment. Accordingly, we find that the complaint sets forth allegations that satisfy the first factor of the test for a Title VI violation. (emphasis added)

2. Notice

[38] The second part of our inquiry focuses on whether the district had sufficient notice of the racially hostile environment at McClintock High.

The Department of Education's interpretation provides that a district may have either actual or constructive notice of racial harassment. 59 Fed. Reg. 11450-51. Actual notice may occur, as in this case, when a student or parent makes a complaint about racially demeaning incidents to the appropriate educational authorities.

3. The School's Response

[39] Finally, we consider Monteiro's allegation that district officials refused to accept the complaints regarding racial problems at McClintock High School or to put a stop to the students' racist conduct.

Once on notice of the problem, a school district "has a legal duty to take reasonable steps to eliminate" a racially hostile environment. 59 Fed. Reg. 11450. When a district is "deliberately indifferent" to its students' right to a learning environment free of racial hostility and discrimination, it is liable for damages under Title VI. Gebser v. Lago Vista Indep. Sch. Dist., 118 S.Ct. 1989, 1999 (1998) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388-92 (1989)).

Under this standard, the district is liable for its failure to act if the need for intervention was so obvious, or if inaction was so likely to result in discrimination, that "it can be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390.

There can be no doubt that Ms. Monteiro's amended complaint alleges a pattern of egregious public racial harassment including the use of the epithet "nigger," that Black students and their parents complained but were rebuffed, and that nothing was ever done about the problem.

It goes without saying that being called a "nigger" by your white peers (or hearing that term applied to your Black classmates) exposes Black children to a "risk of discrimination" that is so substantial and obvious that a failure to act can only be the result of deliberate indifference.

[40] We conclude that the amended complaint sets forth allegations that satisfy all three parts of the test for a violation of Title VI based upon a hostile racial environment.

While the KCC administrators refused to do anything unless Plaintiff signed off on his Claims for redress of Federal and State civil rights law violations.    Title VI does confirm the U.S. District court has the power to provide both injunctive and financial damage relief.    The vast majority of legal precedent is contrary to the State's position.

There is no issue here of Congress' ability to preclude the federal courts from granting a remedy for a constitutional deprivation. Even if Congress repealed all statutory remedies for constitutional violations, the power of federal courts to grant the relief necessary to protect against constitutional deprivations or to remedy the wrong done is presumed to be available in cases within their jurisdiction. See Bell v. Hood, 327 U.S. 678, 684 (1946); Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 396 (1971); id., at 400-406 (Harlan, J., concurring in judgment). SMITH v. ROBINSON, 468 U.S. 992 (1984).

While certain Federal Statutes apply only to limit the Eleventh Amendment immunity of the State in certain other matters, the Individual Defendants, Calfee, Makdagon, and Lee are still liable under those and other Federal and State Civil rights Violations for their intentional illegal discriminatory conduct and for their intentionally inflicting emotional distress upon the Plaintiffs.

6. State of Hawaii Employees are not immune from suit for discriminatory actions they commit on the job.

Hawai`i Revised Statutes (HRS) Chapter 662, the State Tort Liability Act, sets out the parameters under which the State of Hawai`i waives its sovereign immunity from suit. HRS §§ 662-2 (1993) provides that "[t]he State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." HRS §§ 662-15(1) (1993) provides that there is an exception to this waiver for

[a]ny claim based upon an act or omission of an employee of the State, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation is valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved has been abused[.] HRS §§ 662-2.

Intentional illegal discriminatory actions have never been exempt from redress under the Hawaii State Tort Liability Act. And malfeasance in conducting official investigations by a State Agency are indeed actionable under State law. TSEU, v. JEYTE NO. 20489; APPEAL FROM FIRST CIRCUIT COURT (CIV. NO. 94-1553) JUNE 30, 1998. Thus the employee defendants are not immune from suit for State of Thus the employee defendants are not immune from suit for State of Federal civil rights violations or intentional torts.

STATE v. HOSHIJO, 22379 (9-12-2003) 76 P.3d 550 makes it clear that University of Hawaii employees are liable and responsible for their discriminatory tort actions. And so is the

University, as their employer under State law.

> The [c]ourt's conclusion that Wallace was an agent acting within the scope of his authority means that contrary to his claim Wallace was not a private individual acting entirely in a private capacity, but a public employee or agent for the purposes of First Amendment Analysis. . . . The [c]ourt concludes that Wallace's use of the word "nigger" did not involve a matter of public concern. Therefore, the words spoken by Wallace to . . . [Complainant] on February 18, 1995, were not entitled to First Amendment protection. Thus, as a matter of law, the . . . HCRC's actions were not prohibited by the First Amendment, and Wallace is liable for his conduct. (Emphasis added.)
>
> The Arena is a public accommodation owned by UH, a state university.[fn25] Thus, as an owner, UH is liable for the discriminatory acts of its agents and employees under the doctrine of respondeat superior. Under that doctrine UH is liable for Wallace's actions if Wallace was an agent or an employee of UH acting within the scope of his authority.
>
> We conclude that Wallace's statements i.e., "Shut up you fucking nigger!" and "[J]ust shut up nigger, or I'll kick your ass!", constituted fighting words. In fact, as noted, the racial slur, which is the subject of HRS chapter 489, was accompanied by threats of violence.
>
> This court has held that fighting words are not protected by the First Amendment, and has stated as follows: There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words —————— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.
>
> Such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. In re John Doe, 76 Hawai'i at 95, 869 P.2d at 1314 (brackets, ellipsis points, and emphases omitted) (emphasis added) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)
>
> **("No fact is more generally known than that a white man who calls a black man a `nigger' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate."); see also, Taylor v. Metzger, 706 A.2d 685, 691 (N.J. 1998) ("The experience of being called `nigger,' `spic,' `Jap,' or `kike' is like receiving a slap in the face. The injury is instantaneous." (Quoting Charles R. Lawrence III, Frontiers of Legal Thought II the New First Amendment: If He Hollers Let Him Go: Regulating Racist Speech on Campus, 1990 Duke L.J. 431, 452)).**
>
> For the foregoing reasons, we affirm the court and hold that Wallace's speech was not protected by the First Amendment.

Of course in GRATZ v. BOLLINGER, 539 U.S. 244 (2003), the U.S. Supreme Court ruled again law summer that State Universities and school systems are indeed subject to Federal Jurisdiction under both Title VII, Title VI, and Title IX.    Plaintiff's right to non-discriminatory public education and academic freedom to protest racist teaching is similar to the rights upheld in HOLLISTER v. TUTTLE, 210 F.3d 1033 (9th Cir. 2000) where the court ruled: "a faculty member at PSU, had a clearly established right to speak freely on public educational issues and that it was, therefore, error to recognize qualified immunity on the part of defendants alleged to have retaliated against him by denying him a promotion and pay increases. We, accordingly, reverse this part of the judgment and remand."

### 7.    42 U.S.C. 1981, 1982, 1983, and 1985 CIVIL RIGHTS VIOLATIONS

And even if the State could no be sued for the 42 U.S.C. 1981, 1982, 1983, and 1985 civil rights violations of it's supervisors and employees, contrary to the Hawaii State Supreme Court's own holding in STATE v. HOSHIJO, 22379 (9-12-2003)  76 P.3d 550,  those same State supervisors and employees and agents, Jane Calfee, Jill Makdagon and Mona Lee,  can and should be held responsible in their individual capacities for their illegal discriminatory conduct,  and The State and it's agents and employees should be compelled to provide both injunctive relief and to pay Special, Compensatory and Punitive damages.

### 8.  COLOR OF LAW
#### 42 U.S.C. §§ 1983

[9] To sustain an action under section 1983, a plaintiff must show

(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right. *Rinker v. County of Napa*, 831 F.2d 829, 831 (9th Cir. 1987) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981)).

14] **The Supreme Court has recently adopted the standard of deliberate**

**indifference as the culpability standard necessary to establish section 1983 liability** of a municipality based upon a claim that the municipality's lack of training for police officers was a policy causing a violation of a constitutional right of a person subject to police action. *City of Canton v. Harris,* ___ U.S. ___, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Court in *Canton* expressly reserved the question whether the deliberate indifference standard would also apply to "an underlying claim of a constitutional violation." *City of Canton v. Harris,* 109 S.Ct. at 1204 n. 8. WOOD v. OSTRANDER, 879 F.2d 583 (9th Cir. 1989)

[12] **A number of circuits have held recklessness or gross negligence sufficient to state a section 1983 claim; none has held that only intentional misconduct will suffice.** *See, e.g., Taylor v. Ledbetter,* 818 F.2d 791, 793 (11th Cir. 1987) (en banc) (claim that state officials "were `grossly negligent' or `deliberately indifferent'" is "sufficient to overcome either a *Daniels* or *Davidson* bar"); *Vinson v. Campbell County Fiscal Court,* 820 F.2d 194, 199-200 (6th Cir. 1987) (gross negligence cognizable under section 1983); *White v. Rochford,* 592 F.2d 381, 385 (7th Cir. 1979) (gross negligence or reckless disregard for the safety of others cognizable); *see also Davidson v. O'Lone,* 752 F.2d 817, 828 (3rd Cir. 1984) (en banc), *aff'd sub nom., Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (gross negligence or reckless indifference sufficient) (plurality view).[fn3]

The paragraphs in the complaint set forth the primae facie proof of a 42 U.S.C. 1981 violation of the Plaintiff's right to contract for Federally funded educational services at KCC the same as non-black students, which also violates 42 U.S.C. 1983 violation of the Plaintiff's rights under color of State law and the policy and custom of the KCC to use racial slurs prevalanetly disparaging black people and exclude black Students from admission to and attendance in the Radiology Program at KCC in particular, which justifies aggressive remedial action to redress past discriminatory gender exclusive and racially exclusionary practices and present acts of discrimination suffered by the Plaintiff.

Title VI enforces the Federal right to Non-discrimination in Federally funded Educational programs and Article X Section 1 of the State Constitution make discrimination in public education in Hawaii unconstitutional as well. Hence, these Defendants cannot and here have not so far argued that they were ignorant of the State and Federal anti-educational discrimination

constitutional provisions. Furthermore, as both Jill Makdagon and Mona Lee are school administrators and professionals they are charged with knowing the law as it pertains to Federally funded educational programs in the State of Hawaii and the State of Hawaii Constitution Article IX, Section 1, which specifically bars racial discrimination in the treatment of Federally funded U.S. Army V.A. sponsored veterans in classes or supporting educational services like tutoring in publicly financed educational institutions.

Thus in the case Plaintiff has "demonstrated a "direct causal link" to the racial slur harassment of African-American students in classes and the school Kapio newspaper articles repeatedly and in V.A. paid for tutoring services that were denied Plaintiff due to his race a school, policy or custom as required by City of Canton v. Harris, 489 U.S. 378, 385 (1989).

This policy and practice of barring African-American Students from the Radiology program and those jobs, and the frequently use of the "N....r" racial slur in classes and the Kapiolani CC school newspaper, demonstrates a continuing pattern of historical discrimination as well as justification for aggressive remedial treatment, to correct such an illegal policy and custom." Thompson v. City of Los Angeles, 885 F.2d 1439, 1444 (9th Cir. 1989).   McDADE v. WEST, 223 F.3d 1135 (9th Cir. 2000)

### 11. THE SUM TOTAL AND ALL REASONABLE INFERENCES OF ALL EVIDENCE PRESENTED IN THE COMPLAINT CLEARLY SUPPORTS THE AWARD OF PUNITIVE DAMAGES IN THIS CASE TO DETER FUTURE DISCRIMINATION BY THE DEFENDANTS

The court in Kolstad v. American Dental Association ruled that an employer's conduct need not be "egregious" to satisfy the law's requirement for punitive damages. Once a worker has successfully made a case that a company intentionally discriminated, the worker can win punitive damages if it can be shown that the employer acted "with malice or with reckless indifference," focusing on the state of mind of the supervisor. KOLSTAD v. AMERICAN

DENTAL ASSN., 527 U.S. 526 (1999)    In this case in systematic discrimination against African-American male students was alleged and can be proven.   Given the State of Hawaii commandment of non-discrimination in Title VI, the defendants cannot say they were unaware of their obligation to craft non-discriminatory D.O. E. employment standards.

The Defendants should know that retaliating against a student who reasonably complained that UH @ KCC was operating and subjecting him and other student to racially discriminatory teaching, newspaper and tutoring services practices and policies, violates Article X, Section 1 of the State Constitution and Title VI for Federal programs, as well as 42 U.S.C. 1981, 42 U.S.C. 1982, 42 U.S.C. 1983, 42 U.S.C. 1985 and 42 U.S.C. 1986.   Wherefore, Plaintiff prays the court for immediate Injunctive relief as stated above.

Plaintiff certainly bears a reasonable likelihood of prevailing on at least some of his claims and given the harm to Plaintiff compared to none to Defendants caused by Defendants recent action freezing Plaintiff's grandes and transcripts and denying him the right to register fro the summer quarter, injunctive relief is necessary appropriate and compelled by Title VI in this case.

DATED:    Honolulu, Hawaii         May 27, 2006

ANDRE' S. WOOTEN
ATTORNEY FOR PLAINTIFF
JOHN MCALLISTER